HOPKINS, J.T.C.
These are consolidated appeals from judgments of the Essex County Board of Taxation which denied plaintiff’s claim to have property known as Block 1303, Lot 10 and Block 1304, Lots 13 and 14, exempted from local property tax for the years 1979 through 1983, pursuant to the provisions of N.J.S.A. 54:4-3.6.
Plaintiff (Paper Mill) is a nonprofit corporation which has conducted various cultural activities on the premises since 1934. In Paper Mill Playhouse v. Millburn Tp., 95 N.J. 503, 472 A.2d 517 (1984), it was held that these activities complied with the provisions of N.J.S.A. 54:4-3.6 and entitled Paper Mill to a local property tax exemption for the year 1978. The parties have stipulated that the organization and operation of Paper Mill continued to be essentially the same during the years here involved as it was during the year 1978, except as otherwise agreed to by the parties. This exception was based upon a change of circumstance resulting from a fire which rendered the theater building unusable from January 14, 1980 through October 30, 1982. That exception affects Block 1304, Lot 13, for the tax years 1981, 1982 and 1983. The second issue is whether the use of the cottage on Block 1304, Lot 13, as the residence of the director of the Paper Mill Playhouse Art Gallery is consistent with the “exclusive use” requirement of N.J.S.A. 54:4-3.6. The final issue is whether Block 1304, Lot *81 14, also known as the Diamond Mills parcel, was owned by Paper Mill in the sense required by N.J.S.A. 54:4-3.6.
On January 14, 1980, the theater building was damaged as a result of an arsonist’s activities. The three-level office area attached to the theater building was temporarily closed but was reopened and reoccupied in March 1980. The operations building, which was then under construction, was not materially affected by the fire. The cottage on the Paper Mill grounds was not affected.
Within a week after the fire, a trailer was placed in the parking lot (Block 1303, Lot 10), across the street from the theater, and executive operations were conducted from the trailer and the cottage on the Paper Mill site.
No theatrical productions were presented on the premises from January 14, 1980 through October 30, 1982. Further, no major productions, Christmas programs or special events were presented by Paper Mill during this period from any location. However, the Paper Mill children’s theater activities continued without interruption. The spring and fall 1980 and 1981 and spring 1982 seasons were conducted at other sites. Productions were held at Newark Academy, Millburn High School, Millburn Junior High School and the Y.M.-Y.W.H.A. on North-field Avenue in West Orange. There were 188 performances and over 92,000 attendees during this period. These productions returned to the reconstructed theater for the fall 1982 season.
On May 28, 1980, the board of directors of Paper Mill authorized funds for the design and initial phases of reconstruction of the theater. During the entire period that the theater building was out of operation, the planning and administration of the children’s theater series was centered at the Paper Mill site.
The operations building (Block 1303, Lot 13) was completed and the certificate of occupancy was issued in March 1981. It was promptly placed into service and was used initially for storage of equipment and as a staging area for reconstruction *82 of the theater building. Later it was used for construction of props, wardrobe work and set dressings. Ticket sales were conducted from the Paper Mill offices at the site. Further, these offices were the principal location for the efforts to finance and reopen the theater. By mid-1982 there was a fulltime staff of over 20 and several dozen volunteers working toward this end.
On or about October 30, 1981, Paper Mill began work on the productions to be presented at the reopened theater. During 1982, the Paper Mill site was the location of casting efforts and negotiations for production rights to dramatic presentations. During the summer months and in early fall, 1982, there were production activities at the site concerning the set, costumes, casting and orchestration of the initial production. The props and certain set pieces for the shows were built in the operations building from July through October, 1982. Casting activity continued from the Paper Mill site through September 1982, and further, scenery was designed there. The rebuilt theater was completed during October 1982, and a certificate of occupancy was issued on or about October 22, 1982. The theater opened for its first public production, “Robert and Elizabeth,” on October 30, 1982.
The cottage on Block 1304, Lot 13, was occupied by the director of the Paper Mill Playhouse Art Gallery. She is a sister of the co-founder of Paper Mill. The art gallery is a long-standing tradition at the site and has held exhibitions of watercolors, acrylics, oil paintings, mixed media, photography and sculpture. Generally, these are works of lesser known artists who would otherwise have difficulty showing their works. There are usually about eight exhibitions each year. The art gallery’s major purpose is to enhance the general ambiance of a theater outing and to expose many thousands of patrons to original artwork which would otherwise not receive such broad exposure.
No art exhibitions were held during the period when the theater and art gallery were being reconstructed. However, *83 the director continued to maintain contacts with artists and exhibitors interested in participating in the art gallery shows. During this time she was paid a salary of $100 a week and, in addition, had the privilege of residing in the cottage on the Paper Mill property. She lived there during each of the tax years in question.
The director’s presence in the cottage was beneficial to Paper Mill in that she kept a watchful eye on the property at all times. During the reconstruction period, there were various building materials on the site and security was a concern. She regularly reported lights which had been left on, suspicious cars and trucks and other irregularities to the house manager, police or other staff members.
The cottage was also used as a temporary office for the president and executive director of Paper Mill during this time period. It was also used as a place to interview architects, for regular fundraising socials and for meetings with fire adjustors, theatrical consultants and many others.
Block 1304, Lot 14, also known as the Diamond Mills parcel, is part of the subject tract. Paper Mill does not have record title to that parcel. However, Paper Mill has paid the taxes assessed against this property since at least 1936 and has paved and improved the northwest portion located on the west bank of the Rahway River which flows through the lot. That area of the property has been used for parking and other purposes since 1934. The east bank of the river has been used for screening purposes to reduce the view into the backyards of residences in that area. The parties agree that Paper Mill has exercised exclusive dominion and control over all parts of this lot since 1934 in a manner which demonstrates that its use of the property was notorious and adverse to any other party.
It is well established in New Jersey that October 1 of the pretax year is the controlling date to determine whether Paper Mill’s property will be exempt from taxes. N.J.S.A. 54:4-23; N.J.S.A. 54:4-35; Shelton College v. Ringwood, 48 N.J.Super. 10, 136 A.2d 660 (App.Div.1957). Further, this State follows a *84 strict construction of the exemption statute and requires the property to be in actual use on the October 1 date. Institute of Holy Angels v. Fort Lee, 80 N.J.L. 545, 77 A. 1035 (Sup.Ct.1910); Grace and Peace, etc. Church v. Cranford Tp., 4 N.J.Tax 391 (Tax Ct.1982). See also Holy Cross, etc. Church of God v. Trenton, 2 N.J.Tax 352 (Tax Ct.1981), where an exemption was denied property containing a partially completed church on the assessment date.
The issue here, however, is not an exemption predicated upon construction of a new building on property which had not previously been exempt. Rather, the issue concerns the exemption of a theater building in the course of reconstruction on property which had been exempt prior to its destruction by fire. Neither the parties nor the court have been able to find any judicial precedent in New Jersey which applies to the subject factual situation. Y.W.C.A. v. Monmouth Tax Bd., 92 N.J.L. 330, 105 A. 726 (Sup.Ct.1919), is not helpful since its facts indicate that after a fire destroyed the previously exempt building, there were no plans or efforts to rebuild. That is a distinguishing characteristic from the subject case where there is no such indication of an abandonment of the exempt use. Rather, the facts show that within a relatively short period of time, plans were made to reconstruct the theater.
As previously noted, New Jersey’s strict construction of N.J.S.A. 54:4-3.6, the exemption statute, requires the property to be in use on the assessment date in order to qualify for its initial exemption. Both Pennsylvania and California place a similar strict construction on their exemption statutes. Accordingly, it is appropriate to review the judicial decisions of their courts regarding the treatment, for local property tax purposes, of an exempt structure when it is damaged or destroyed by an act of God or, as in this case, by arson, and the exempt organization immediately commences reconstruction of the destroyed structure. The leading ease on this point is Dougherty v. City of Philadelphia, 112 Pa.Super. 570, 172 A. 177 (Super.Ct.1934). That case involved a parochial school located in Philadelphia which had its principal operation on the east side *85 of the street and a smaller building on the west side. Both lots were previously exempt from taxation. The school then acquired another improved lot adjacent to its lot on the west side of the street. In June 1926 it demolished the buildings on both the exempt lot and the adjacent lot, which it had recently acquired, and a single building was constructed for school purposes. The building was occupied about one month after the tax assessment deadline. The court, following its strict interpretation of the Pennsylvania exemption statute, held that the newly acquired lot had not been put to an exempt use as of the assessment date and therefore, would not be exempt for the coming year. However, it held that the previously exempt lot retained its exemption, and in so holding, it stated as follows:
... That lot had acquired a character which clearly entitled its owner to exemption from taxation in 1926 and previous years, and, while ceasing to use the premises for a purpose entitling it to exemption would require that it again be placed on the tax rolls, the facts here present do not indicate such a cessation or change of use. The premises had been used for school purposes until sometime in June, 1926, the time when schools usually close for a summer vacation; the work of rebuilding was prosecuted with diligence and completed in about seven months, when the premises continued to be used for school purposes. Certainly it would not be contended that, when a school is closed during the usual vacation period of June, July and August, there is such a change as would make the property liable for taxes during that period. The same would be true of the usual Christmas vacation which frequently extends beyond the first day of January, the beginning of the tax year in Philadelphia. Again, assume that painting, decorating, or other repairs required the temporary suspension of school. Could it be said that the premises lost their character as a purely public charity? The only reasonable answer would be that it could not be so maintained. [172 A. at 179]
In Long Branch v. Monmouth Medical Center, 138 N.J.Super. 524, 351 A.2d 756 (App.Div.1976), aff'd 73 N.J. 179, 373 A.2d 651 (1977), the California case of Cedars of Lebanon Hospital v. Los Angeles County, 35 Cal.2d 729, 221 P.2d 31 (Sup.Ct. 1950), was cited and relied upon as an authority in the construction of N.J.S.A. 54:4-3.6, the applicable exemption statute. The Long Branch court adopted the interpretation of the California court in establishing the extent of the provision “actually and exclusively used for hospital purposes.” The Cedars of Lebanon case also had at issue the exemption of new construction not previously used for exempt purposes. In passing on that *86 point, it was noted that states such as Colorado and New Mexico, which follow a doctrine of liberal construction, might allow an exemption where considerable progress had been made in erecting a building and there was a clear intention that it would be used for charitable purposes upon completion. Id. 221 P.2d at 40. However, as California followed the strict interpretation principle, it affirmed the denial of an exemption where the building was under construction on the determinative tax date. In so affirming the strict test, the court stated as follows:
... This is not a case involving repairs, restoration or enlargement of a hospital or essential hospital facilities where the construction project assumes the character which had previously attached to the property for exemption purposes pursuant to its actual use, but rather here the problem concerns new buildings on property which had not yet acquired a definite character, and would not until completed and used for the designated hospital purposes. Dougherty v. City of Philadelphia, 112 Pa.Super. 570, 172 A. 177, 180. [221 P.2d at 40]
The above quotations from the Pennsylvania and California cases show that even though they strictly construe their exemption statutes by requiring an exemption to first be established by actual use, they recognize that a continued exempt character exists where property had previously been exempt. This principle is fully consistent with the underlying philosophy of N.J. S.A. 54:4-3.6 which requires an exempt use to exist on the October 1 assessing date in order to permit taxing districts to prepare budgets based upon the current tax assessment rolls. Any reduction in the assessment roll during the tax year would interfere with that budget preparation procedure. Schizophrenia Found, of N.J. v. Montgomery Tp., 6 N.J.Tax 439 (App.Div.1984).
Since the Paper Mill property was exempt as of the assessment date prior to the fire, Millburn should not have relied upon it as a tax source in preparing its budgets for the subject years. Further, the prompt manner in which Paper Mill acted to reconstruct its theater, and Paper Mill’s continuing activities in support of its offsite presentations of the children’s theater activities, all join in support of the proposition that its exemption was not lost as a result of an arsonist’s activity. *87 Indeed, the basic reason for exemptions would be undermined if N.J.S.A. 54:4-3.6 was construed to require tax assessors to add to a calamitous condition of an exempt organization by immediately asserting a tax when an exempt structure is rendered unusable by a man-made disaster or by an act of God.
Consonant with the purpose for which exemptions are granted pursuant to N.J.S.A. 54:4-3.6, and also consistent with the interpretations given to similar statutes in Pennsylvania and California, the exempt character of the Paper Mill property carried over to the subject years.
The subordinate issues relative to the cottage and title to the Diamond Mills parcel have no effect on the exemption status of the property. The cottage was used to house the director of the art gallery in 1978, and the Supreme Court’s opinion approved its exemption for that year. While the art gallery was being reconstructed, that cottage retained its exempt character. Further, the undisputed evidence shows that the director served the purposes of Paper Mill by her presence on the premises as a caretaker. See Clinton Tp. v. Camp Brett-Endeavor, Inc., 1 N.J.Tax 54 (Tax Ct.1980).
The Diamond Mills parcel, to which Paper Mill does not have title of record, has been occupied by Paper Mill for over thirty years. Case law has imposed the requirements of adverse possession.
The principles on which the doctrine of title by adverse possession rests, are well settled. The possession must be actual and exclusive—adverse and hostile—visible or notorious—continued and uninterrupted. [Foulke v. Bond, 41 N.J.L. 527, 545 (E. & A. 1879)]
This test has remained standard except that the requirement of hostility has been eliminated. Mannillo v. Gorski, 54 N.J. 378, 255 A.2d 258 (1969).
The parties have agreed that Paper Mill has occupied the Diamond Mills parcel in an adverse and notorious manner for over thirty years. This makes N.J.S.A. 2A:14-30 applicable. That statute provides that thirty years of such actual possession of real estate shall “vest a full and complete title in every *88 actual possessor or occupier of such real estate.” Full and complete title equates with ownership as used in N.J.S.A. 54:4-3.6. Jersey City v. N.J. Baptist Convention, 18 N.J.Misc. 209, 12 A.2d 150 (State Bd. of Tax App.1940).
On the basis of the above, the Paper Mill property continued to qualify for exemption during the years here in dispute.
The Clerk of the Tax Court will enter a judgment providing that all lots in dispute are exempt from local property taxes for the years 1979 through 1983.